### TAYLOR v. SHUFFIELD. *
### No. 7704.

Court of Civil Appeals of Texas. Austin.
May 25, 1932.

Rehearing Denied June 15, 1932.

*Writ of error granted.

E. A. Wallace, of Cameron, for appellant.

E. A. Camp, of Rockdale, and W. Ray Scruggs, of Houston, for appellee.

BLAIR, J.

Appellee, Carlton Shuffield, a minor about 19 years of age, by his father as next friend, sued appellant, Dr. G. B. Taylor, for malpractice in connection with the performance of a tonsillectomy and a faulty diagnosis and treatment of appellee for adenoids and suppurating ears, alleged to have happened some 15 years prior to the filing of this suit. A jury trial upon special issues resulted in a verdict and judgment for appellee in the sum of $6,250; hence this appeal.

Appellee alleged that appellant held himself out to the public as being a specialist in the treatment of diseases of the ear, nose, and throat; and, first, that in connection with the performance of a mere tonsillectomy by appellant on appellee, appellant also removed his uvula, palate, and tonsillar pillars, thereby causing appellee to lose his power of speech; and, second, that at the time of the performance of the tonsillectomy, and in connection therewith, appellant made a faulty diagnosis and treatment of appellee for adenoids and suppurating ears, thereby causing him to lose his power of hearing. Additional damages alleged were that, as a result of the operation and the faulty diagnosis and treatment of appellee, he had the mentality of a child about 6 years of age, although he was about 19 years of age.

The first phase of the case was predicated upon two alleged theories of recovery: (a) That the removal of the uvula, palate, and tonsillar pillars of appellee, a child 4 years of age, without the consent of his parents, constituted an assault or trespass, for which appellant was liable in damage, without regard to any question of negligence; (b) that appellant was negligent in removing appellee's uvula, palate, and tonsillar pillars while performing a mere tonsillectomy, because (1) he failed to use reasonable skill, care, and diligence in his professional work; (2) he failed to use approved methods and instruments in general use for the performance of the operation; and (3) he did not possess the experience, skill, knowledge, or ability to perform the tonsil operation.

The second phase of the case was predicated upon the alleged negligence of appellant (1) in failing to discover in connection with the tonsillectomy that appellee had adenoids; and to recommend their removal to appellee's parents as a part of the tonsillectomy; and (2) the failure of appellant to properly treat appellee for adenoids and suppurating ears, the latter being alleged to have resulted from the diseased adenoids.

Appellant filed a general denial, a special denial that he did not remove appellee's uvula, palate, and tonsillar pillars, and a special plea that appellee's defects of speech and hearing were congenital defects; or that he was practically a deaf mute from his birth.

By his first five propositions appellant contends that the trial court erred, first, in admitting in evidence over his objection the testimony of appellee's parents, nonexpert and incompetent witnesses as to disease, to the effect that during the 15-year period from the date of the tonsillectomy to the date of trial of this case appellee had no disease of the ear, nose, or throat; and, second, in admitting in evidence the expert testimony of three ear, nose, and throat specialists, who examined appellee's throat either shortly before this suit was filed, or shortly before the trial, to the effect that from their examinations of appellee's throat, and finding his uvula, palate, and tonsillar pillars, or considerable portions thereof, gone, and assuming along with other facts presented in the hypothetical questions, that appellee had no disease of the ear, head, or throat during the 15-year period as testified to by his parents, it was their opinion that such parts, or portions thereof, had not been removed by atrophy or disease, but by appellant in connection with the performance of the tonsillectomy; and, if so, the removal of such parts, or portions thereof, was due in their opinion either (1) to the use by appellant of improper methods or instruments in performing the tonsillectomy; or (2) to the negligence or want of reasonable care of appellant in performing the tonsillectomy; or (3) to the lack of knowledge, skill, or ability of appellant to perform the tonsillectomy. We have reached the conclusion that all of the testimony was improperly admitted in evidence.

The burden was upon appellee to prove that appellant removed his uvula, palate, and tonsillar pillars, or such considerable portions thereof as would affect his power of speech, in connection with the tonsillectomy per-

formed some 15 or 16 years prior to the filing of this suit and trial. Appellant both pleaded and testified that he did not remove such parts, or any considerable portion thereof, in the performance of the tonsillectomy.

One of the experts whose deposition appellee took and introduced in evidence, testified that from his examination of appellee's throat shortly before the trial, and about one year after this suit was filed, he found the uvula, palate, and tonsillar pillars entirely gone, or completely obliterated; and that from the nature of the scars and condition of the throat at that time he was of the opinion that these parts had not been removed by atrophy or disease, but by appellant in the performance of the tonsillectomy about 16 years prior to that time. The other two experts whose depositions appellee took and introduced in evidence over objection, and who appeared to be equally as well qualified as the first mentioned expert, testified that, from their examination of appellee's throat shortly before this suit was filed, they found only considerable portions of the uvula, palate, and tonsillar pillars gone; and that from such examination it was not possible for them to say what caused their absence or removal; but that their absence or removal could be accounted for in four ways, as follows: (a) By congenital defects, or those defects existing at and from birth; (b) by traumatic injury to the throat; (c) by disease causing a sloughing off of those parts, or by atrophy; and (d) by operation.

■ The burden was upon appellee to prove that, during the intervening period of 15 or 16 years from the date of the tonsillectomy to the date of the trial, neither of the first three eventualities was responsible for the absence of his uvula, palate, and tonsillar pillars, or such considerable portions thereof as would deleteriously affect his power of speech. Particularly was this true with respect to negativing the possibility, testified to by all the experts, that the absence of such parts, or considerable portions thereof, may have been the result of disease, causing a sloughing off of these parts; or by atrophy, a drying up or diminution of these parts for lack of proper nutrition. In attempting to make this proof, appellee's mother testified, as follows:

"Ever since the operation why the phlegm has collected in his throat and at night gets out on his pillow.

"Q. Did that ever happen before the operation? A. No sir it never did.

"Q. State whether or not that condition began right after the operation? A. Yes sir right after the operation.

"Q. Has it or has it not continued ever since? A. Yes sir it has continued ever since.

"Q. Mrs. Shuffield has Carlton outside of this condition of the phlegm you describe, has he ever had any kind of disease of his throat of any kind? A. No sir."

The last question and answer were objected to because of the incompetency of the nonexpert witness to testify that appellee had no disease of the throat, such being a matter for professional or expert testimony. Over the same objection, appellee's father was permitted to testify as follows: "Q. Has Carlton at any time had any apparent; outside of adenoids and tonsilitis, has Carlton at any time had any apparent disease of his mouth or throat? A. No sir never has."

The effect of the questions asked and the answers thereto was to permit these nonexpert witnesses to testify that appellee had suffered no disease during the 15 or 16 year period which would cause the sloughing off or atrophy of the parts, or portions thereof, alleged to have been removed by appellant while performing the tonsillectomy on appellee.

■ We are clear in the view that this was error. The decisions uniformly hold that whether a person has a disease is a question calling for professional or expert testimony. Manifestly this rule would extend to any throat disease, and particularly to any disease which might cause the sloughing off or atrophy of the parts of the throat. It is true that a nonexpert witness may testify to the presence of disease of an outward nature, or one physically apparent and obvious to any person; or to the nonpresence or nonappearance of any physical or outward evidences of disease of a person whom the witness had the opportunity to closely observe; but a nonexpert witness cannot testify that a person did not in fact have any disease of the throat or mouth during any given period of time. In the instant case the expert witnesses testified to a number of specific diseases which might have caused the sloughing off or an atrophy of parts of appellee's throat during the 15 or 16 year period in question. They gave none of the physical symptoms or physical evidences of these particular diseases of the throat while running their course, such as might be observed by any person, or especially by the parents of appellee, who constantly associated with him during the period in question. Some of these diseases may have been of an insidious nature and only ascertainable by those engaged as specialists for treatment of such throat diseases. So, if the conclusion of appellee's parents that he had no disease of the throat during the period in question be eliminated as incompetent evidence, then the only remaining part of this nonexpert testimony is that of appellee's mother to the effect that continuously since the operation appellee has been discharging phlegm from the mouth and throat, which to the lay mind would indicate that appellee had continuously from the date of the tonsillectomy suffered from some character of throat or mouth dis-

ease, the nature and deleterious effect of which only experts are competent to testify. Graham v. Gautier, 21 Tex. 111; Floyd v. Michie (Tex. Civ. App.) 11 S.W.(2d) 657; McGraw v. Kerr, 23 Colo. App. 163, 128 P. 870; Houghton v. Dickson, 29 Cal. App. 321, 155 P. 128; Ewing v. Goode (C. C.) 78 F. 442; Hall v. Steele, 193 Cal. 602, 226 P. 854; Robbins v. Nathan, 189 App. Div. 827, 179 N. Y. S. 281; Lubbee v. Hilgert, 135 App. Div. 227, 231, 120 N. Y. S. 387; Brown v. Goffe, 140 App. Div. 353, 125 N. Y. S. 458; Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564; Funk v. Bonham (Ind. App.) 151 N. E. 22; Moline v. Christie, 180 Ill. App. 334; Bennan v. Parsonnet, 83 N. J. Law 20, 83 A. 948; De Long v. Delaney, 206 Pa. 226, 55 A. 965; Carey v. Mercer, 239 Mass. 599, 132 N. E. 353; Angulo v. Hallar, 137 Md. 227, 112 A. 179.; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Patterson v. Marcus, 203 Cal. 550, 265 P. 222; Norkett v. Martin, 63 Colo. 220, 165 P. 256; Slimak v. Foster, 106 Conn. 366, 138 A. 153; Phebus v. Mather, 181 Ill. App. 274; Ramberg v. Morgan (Iowa) 218 N. W. 492; Rainey v. Smith, 109 Kan. 692, 201 P. 1106; Feeney v. Spalding, 89 Me. 111, 35 A. 1027; Delahunt v. Finton, 244 Mich. 226, 221 N. W. 168; London v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487; McDaniel v. Wolcott, 115 Neb. 675, 214 N. W. 296; Van Epps v. McKenny (Sup.) 189 N. Y. S. 910; Hunter v. Burroughs, 123 Va. 113, 96 S. E. 360; Holton v. Burton, 197 Wis. 405, 222 N. W. 225.

 The maxim of res ipsa loquitur has no application to this case. That is, it cannot be inferred from the fact that experts examined appellee and found, shortly before the trial of this case, that his uvula, palate, and tonsillar pillars, or considerable portions thereof, were gone, that appellant removed these parts in connection with the performance of a tonsillectomy upon appellee 15 years prior to such examination; because all the experts testified that the absence of these parts could have resulted from numerous diseases during the 15-year period in question. The question here is not the establishment of a bad result from a known injury, but the establishment of the injury itself, which, according to the opinion of each expert, might have resulted from (a) the operation in question, or (b) congenital defects, or (c) traumatic injury, or (d) disease, causing a sloughing off or atrophy of the parts of appellee's throat in issue. Whether appellee had any such disease during the 15-year period was a matter for expert testimony. Each hypothetical question propounded to each expert, and, with the exception of Dr. Baker, the opinion of each expert, was predicated solely upon the assumption that the nonexpert testimony of appellee's parents established the fact that he had no disease of the throat during the 15-year period. Since this nonexpert testimony, in the form given, was incompetent, it was error to assume in the hypothetical questions that appellee had no disease of the throat during the 15-year period.

 The hypothetical questions propounded to the experts were also improper because they did not include all the facts. Neither of them included or referred to the fact testified to by appellee's mother, that he had continuously, since the date of the tonsillectomy discharged phlegm from his throat and mouth. To the lay mind this discharge of phlegm would be evidence or symptom of disease; but whether it was sufficient evidence or symptom of disease, which, during the 15-year period in question, might have caused the sloughing off, or atrophy of appellee's uvula, palate and tonsillar pillars, or such considerable portions thereof as would deleteriously affect his power of speech, was a matter for the expert. It was clearly error not to embrace this undisputed fact in the hypothetical questions propounded to the experts as a predicate for their opinion as to whether appellee had any disease of the throat during the period in question, which might have deleteriously affected his power of speech. Mr. Stryker, in his recent book entitled Courts and Doctors, p. 149, says that "the foundation of an expert's opinion are the facts upon which he predicates it." The decisions are uniform in holding that it is the duty of the trial and appellate courts to require that all undisputed facts as well as facts proved, though controverted, be fairly stated without exaggeration in the hypothetical question, so that the expert may say whether, if such facts are true, he can form an opinion on the question or matter submitted; and, if so, what that opinion is. Of course, it is permissible, where some of the facts are in dispute, for each party to frame his hypothetical question to include the facts as he claims the evidence shows them to be; but the facts assumed can be those only which the trial court, or the appellate court, determines have been fairly established by the evidence. The jury is then left to determine whether the facts upon which the expert opinion is predicated have been proved by a preponderance of the evidence; and, if so, give such weight to the expert's opinion resting on the facts found as it deserves. Ft. W. Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S. W. 1130; Jewett v. Brooks, 134 Mass. 505; People v. Vanderhoof, 71 Mich. 158, 176, 39 N. E. 28; Stearns v. Field, 90 N. Y. 640; Cochran v. Gritman, 34 Idaho, 654, 203 P. 289; W. U. Tel. Co. v. Hughey, 55 Tex. Civ. App. 403, 118 S. W. 1130; Stryker on Courts and Doctors, pp. 148-49; Wigmore on Evidence, vol. 1, §§ 675-686 (2d Ed.).

 Over objection that they were nonexpert and incompetent to testify as to such matters, appellee's parents were permitted to

testify that he could speak about as well as any normal child of his age before the performance of the tonsillectomy by appellant; but that continuously since the operation he has been unable to speak so as to make himself understood with the exception of a few words; that, of their knowledge, he had not received any traumatic injury to his throat before or after the tonsillectomy; and that no one except appellant had operated upon his throat. We think the parents could testify to each of these facts as being matters relating to physical appearance, or of matters of an outward nature, obvious to any person, and particularly to his parents, who were shown to have constantly associated with and cared for appellee all of his life. See authorities above cited; also St. Louis S. W. Railway Co. of Texas v. Lowe (Tex. Civ. App.) 97 S. W. 1087; Ford v. Couch (Tex. Civ. App.) 16 S.W.(2d) 869; 48 C. J., 1150.

■ In connection with this phase of the case relating to appellee's alleged inability to speak after the operation, appellant requested, but the court refused to submit, the following special issues:

"Special Issue No. 3: Was Carlton Shuffield's inability to speak, if you find he is unable to speak in whole or in part, existing before and at the time the defendant operated upon him? Answer as you may find from a preponderance of the evidence."

"Special Issue No. 4: Was Carlton Shuffield's inability to speak, if you find he is unable to speak in whole or in part, caused by disease existing either before or after the operation upon him by defendant? Answer 'Yes' or 'No' as you may find from a preponderance of the evidence."

These issues should have been submitted. Appellee alleged that, as the result of performance of the tonsillectomy, his power of speech was destroyed, "in whole or in part." Appellant filed a general denial, and offered proof tending to show that appellee's inability to speak, "in whole or in part," existed prior to and at the time the tonsillectomy was performed by appellant. That an affirmative answer to this issue would have defeated appellee's right of recovery on this phase of the case is apparent from the issue itself; because, if the inability to speak existed prior to and at the time the operation was performed, manifestly the operation was not responsible for such defects of speech.

The evidence above detailed was sharply conflicting upon the issue of whether appellee's inability to speak, in whole or in part, was caused by disease existing either before, or particularly after, the operation upon his throat by appellant; and, as above held, if intervening disease caused the injury to his throat, appellee could not recover.

Appellee's parents also admitted that shortly before taking him to appellant for treatment he began to suffer of earache; that a discharge from his ears appeared; that his hearing became impaired; that this discharge from the ears appeared intermittingly after the operation; and that his hearing continued to grow worse. All the experts testified that loss of power of hearing by a child would directly affect its power of speech. So, if the loss of appellee's hearing was due to disease, and, as the result of the loss of his hearing from such disease, appellee also lost his power of speech, appellant would not be liable, unless appellant be found, under the second phase of the case, to have made a faulty diagnosis and treatment of appellee's ears, which resulted in the loss of his power of hearing.

■ Passing to a consideration of the second phase of the case, and particularly of the allegations that at the time of the performance of the tonsillectomy, and in connection therewith, appellant made a faulty diagnosis and treatment of appellee for adenoids and suppurating ears, thereby causing him to lose his power of hearing, we find the same errors with respect to the admission of the nonexpert testimony of his parents and predication thereon of hypothetical questions to experts as occurred in connection with the first phase of the case, relating to the action for damages for the removal of appellee's uvula, palate, and tonsillar pillars, thereby causing appellee to lose his power of speech; that is, the parents were permitted to testify that appellee had no disease of the head or ears during the 15-year period in question, and hypothetical questions assuming that appellee had no disease as testified to by his parents were propounded to the experts. Under our above conclusions, this testimony was improperly admitted in evidence.

[13] The court also erred in refusing to submit special issues Nos. 1 and 2, requested by appellant, as to whether appellee's deafness existed before and at the time the tonsillectomy was performed; and as to whether his deafness was caused by disease existing either before or after the performance of the tonsillectomy. The issues were raised by the testimony of appellee's parents to the effect that prior to the operation appellee's ears were discharging and his hearing affected; and that his ears discharged intermittingly after the operation and his hearing became worse. The issues were also raised, particularly by the testimony of Dr. Key, as well as by the testimony of all experts, that appellee's suppurating ears may have resulted from many causes other than adenoids; or improper treatment of adenoids; and that suppurating ears, or the disease evidenced thereby, often caused the loss of the ability to hear.

■■ Appellee charged appellant with having made a faulty diagnosis and treat-

ment of him for adenoids and suppurating ears, thereby causing him to lose his power of hearing, and, in the language of the decisions, the burden was upon appellee to show negligence, or failure on the part of appellant to use the requisite care and skill in the diagnosis and treatment of him for adenoids and suppurating ears, and the causal connection between his breach of duty in that regard and the loss of appellee's ability to hear. To meet this burden appellee was also required to at least negative by competent positive evidence that his loss of ability to hear did not result from (a) congenital defects; (b) traumatic injury; (c) disease existing either before or after the alleged faulty diagnosis and treatment was begun and concluded. It is also the rule in this connection "that unless improper treatment follows, a wrong diagnosis gives no right of action." 48 C. J. § 113, pp. 1126, 1127. This same authority, at page 1142, announces the following rule applicable to this case: "Negligence on the part of a physician or surgeon is not presumed, but must be affirmatively proved. The same is true ordinarily with respect to the possession by the physician or surgeon of the requisite skill and learning. On the contrary, in the absence of evidence on the subject, it will be presumed that a physician or surgeon discharged his full duty to the patient, including the exercise of reasonable care and skill in his treatment. Save in those exceptional cases governed by the doctrine of res ipsa loquitur, no inference of negligence or want of skill can be drawn from the result of treatment by a physician or surgeon. Thus no presumption of negligence or want of skill arises from the mere fact that the treatment given was unsuccessful, or failed to produce the best results."

The following Texas authorities support in general the above rules: Graham v. Gautier, 21 Tex. 111; Urrutia v. Patino (Tex. Civ. App.) 10 S.W.(2d) 582; Id. (Tex. Civ. App.) 297 S. W. 512; Ford v. Couch (Tex. Civ. App.) 16 S.W.(2d) 869; Turner v. Stoker (Tex. Civ. App.) 289 S. W. 190; Hamilton v. Harris (Tex. Civ. App.) 223 S. W. 533; Floyd v. Michie (Tex. Civ. App.) 11 S.W.(2d) 657. See, also, authorities first above cited.

▮ The trial court erred in excluding the answer of Dr. Key to a cross-interrogatory explaining his office card or record of an examination of appellee either shortly before or about one year before his tonsils were removed by appellant. The office card or record reads as follows:

M. B. Cameron
Shuffield, Carlton 4 1915

7/6 2.50 · 2.50 Hard of hearing. Unable to talk well. Says a few words like "mama," "papa," "all gone," etc.

Ad. Removal advised.

[Signed] Sam N. Key.

Dr. Key testified that he had no independent recollection of the examination, but sought to explain his office record as follows: "In answering this interrogatory, I would like to explain just what my record regarding Carlton Shuffield means to me. The first paragraph where it states as follows: 'Hard of hearing. Unable to talk well.' This is the statement that was given to me by the person who brought this patient to me. The next sentence where it states: 'Says a few words like "mama," "papa," "all gone," etc.' This is what the person who brought this patient to me stated that he could say. This does not mean that I say that he could use those words. The foregoing history is merely what the person who brought the patient to me related to me regarding the patient. I explain this in detail because it might appear that the above was my opinion, when, as a matter of fact, it is merely the history of the case as it was related to me. The reason the words 'mama,' 'papa,' 'all gone' were placed in quotation marks is because it is a well known fact that parents of deaf and dumb children in their eagerness to believe that their children are not deaf and dumb often think that their children can say simple words like these, when in reality they are unable to talk. I believe that is the reason these words were placed in quotation marks, for I probably realized that I was dealing with a deaf child. It is very significant in this case that I made no recommendation for treatment of the hearing or speech. Had I believed any treatment would be beneficial I would have so indicated on the record made on this case, but there is the simple notation of removal of adenoids advised."

The testimony was excluded upon the objection that the office card or record spoke for itself. This was error. The office card or record was Dr. Key's private record, kept by him in connection with his business. He alone knew what the terms used meant to him, and unquestionably he had the right to explain how he obtained the information and what it meant to him.

▮ Shortly after filing his suit, appellee caused the deposition of appellant to be taken upon oral interrogatories and answers thereto. Appellant objected to these being introduced in evidence, contending that the statutes do not authorize the taking of the deposition of a party to the suit by oral answers, except upon written interrogatories. We do not sustain this contention, because article 3752 (Acts 1919) provides that: "The

testimony of any witness and of any party to a suit by oral deposition and answer may be taken in any civil case in any district or county court of this State, in any instance where depositions are now authorized by law to be taken."

This article 3752 (act 1919) amended article 3663 (act 1907), which provided that "the testimony of any witness by oral examination and answer may be taken." In the case of Farmers' & Merchants' Nat'l Bank v. Ivey (Tex. Civ. App.) 182 S. W. 706, it was held that this prior act did not provide for the taking of depositions of parties on oral interrogatories. The language of the new act is that "the testimony of any witness and of any party to a suit by oral deposition and answer may be taken." This language clearly evidences the intention of the Legislature to authorize the taking of the deposition of a party to a suit upon oral interrogatories and answers. See, also, in this connection articles 3763 and 3769.

We have carefully examined appellant's remaining propositions and overrule them without discussion; but reverse the judgment and remand the cause under our above holdings.

Reversed and remanded.

---

*Writ of error granted.